**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| THOMAS HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 8:17 CV-156 |
| | ) | |
| v. | ) | **COMPLAINT AND JURY DEMAND** |
| | ) | |
| SAPP BROS. PETROLEUM, INC. and | ) | |
| SAPP BROS. FUEL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Thomas Harris ("Harris"), in support of his claims against Defendants Sapp Bros. Petroleum, Inc. ("Sapp Bros. Petroleum") and Sapp Bros. Fuel, Inc. ("Sapp Bros. Fuel") (collectively, "Sapp Bros." unless otherwise referred to individually), alleges and states as follows:

## INTRODUCTION

1.      Harris was employed by Sapp Bros. for approximately two (2) years.  Harris was terminated because of his consistent questioning and challenging of Sapp Bros.' business and fuel delivery practices that Harris reasonably believed were fraudulent.  Sapp Bros. terminated Harris one (1) day after he again raised concerns of fraud with respect to Sapp Bros. fuel delivery practices one too many times.

2.      Harris challenges the termination of his employment and seeks relief from this Court on the grounds of retaliatory discharge under the False Claims Act, 31 U.S.C. § 3730, and the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1114.  Harris also brings an action for unpaid wages under the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1231.

1

## PARTIES & VENUE

3.      Harris is an individual residing in Omaha, Nebraska.

4.      Sapp Bros. Petroleum is organized and headquartered in Nebraska, with its principal place of business in Omaha, Nebraska.

5.      Sapp Bros. Fuel is organized and headquartered in Nebraska, with its principal place of business in Omaha, Nebraska.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1367(b) because Sapp Bros.' principal places of business is within the district and a substantial part of Sapp Bros.' conduct giving rise to the claims contained herein occurred within the district.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution, laws, or treaties of the United States.

8.      This Court has supplemental jurisdiction over Harris' state law claims pursuant to 28 U.S.C. § 1367(a) because Harris' state and federal law claims share a common nucleus of operative facts.

## BACKGROUND FACTS

9.      Sapp Bros. provides different types of fuels to its clients based on client needs. Sapp Bros. sells 60/40 diesel fuel, and represents that it also sells Powermax diesel, ultra-low-sulfur diesel, premium biodiesel, K-1, gasohol, unleaded fuels, and propane. Sapp Bros. also sells specialty fuels such as aviation, racing gasoline, and methanol.

10.      "60/40" diesel fuel is special because it is a blend that helps prevent the fuel from "gelling" in cold temperatures. The term "60/40 fuel" refers to a specific diesel mixture and is not synonymous with diesel treated with additives or "winterized diesel."

2

11.     Customers who order a specific mixture or type of fuel pay for and expect to receive the specific mixture or type of fuel they ordered.

12.     Sapp Bros. is fully aware of customers' expectations when ordering specific fuel. In fact, Sapp Bros.' website represents that its "products are delivered to our customers in a timely and accurate fashion."

13.     Sapp Bros.' awareness of customers' expectations is further demonstrated by the fact that Vice President of Sapp Bros. Petroleum – Refined Fuels, Eric Ziph ("Ziph") regularly directed Harris to obtain fuel from a specific supplier, who was known to have higher quality fuel, for the clients Ziph personally preferred.

14.     Sapp Bros. knows that 60/40 fuel is not synonymous with diesel treated with additives. While employed by Sapp Bros., management often directed Harris to obtain and deliver true 60/40 fuel to certain customers.  Fuel that was not 60/40 fuel, but nonetheless was sold to customers who requested 60/40 fuel as 60/40 fuel was colloquially referred to as "Special 60/40 fuel."

15.     Sapp Bros. designates fuel as either "unit fuel" or "non-unit fuel," which refers to type of storage container for the fuel. Customers paid more for unit fuel than non-unit fuel.

16.     Harris was hired at Sapp Bros. as a driver in October of 2014.

17.     Harris directly reported to Randy Benson ("Benson"), who is the Fleet Manager at Sapp Bros. Petroleum.  Harris also had regular interactions Ziph.

18.     As a driver, Harris' job duties required him to deliver fuel to Sapp Bros.' clients in Nebraska and Iowa.  In making these deliveries, Harris was required to record on a Sapp Bros.' document certain information including the amount, quality, and type of the fuel delivered.

3

19.     In making deliveries, Harris was also required to record whether the delivery was for "unit fuel" or "non-unit fuel," as well as whether the fuel was 60/40 or some other type.

20.     Throughout Harris' employment at Sapp Bros., Harris was a hard-working and responsible employee and provided above satisfactory performance and service to Sapp Bros.' clients.

21.     Harris was compensated at a rate of $16.00 an hour, plus additional compensation, referred to as "gallon pay," based on the number of gallons of fuel that he delivered. Delivering more gallons of fuel translated into more pay for the deliveries.

22.     Additionally, the type of fuel delivered had an impact on Harris' compensation, as delivery of certain types of fuel yielded greater compensation than delivery of other types of fuel, as set forth more fully below.

23.     Throughout his employment, Sapp Bros. refused to pay or underpaid Harris' gallon pay, without explanation. Sapp Bros. similarly refused Harris' repeated requests for documentation that showed Sapp Bros.' calculations of his unpaid or underpaid gallon pay.

24.     In one instance, on or about August 2016, Harris received only a fraction of the gallon pay to which he was entitled, so he raised the issue of underpayment with Benson. Benson responded by telling Harris that "he needed to stop pushing back" and that Sapp Bros. "didn't like push back." Based on Benson's response, Harris feared losing his job.

25.     Benson's response was consistent with the work environment Harris experienced while at Sapp Bros., where the attitude was that employees were to keep their heads down and not raise concerns or ask too many questions because those who did would be terminated for raising concerns and asking questions.

4

26.     Sapp Bros.' management fostered a culture in which employees knew that if they did not keep their heads down or if they asked too many questions, they would be subjected to adverse employment actions, including termination.

**Harris Raises Concerns About Deliveries to Kiewit at its STRATCOM worksite**

27.     One of the clients Harris regularly delivered to was Kiewit Corporation ("Kiewit"), at its worksite located at the United States Strategic Command ("STRATCOM"). The fuel Sapp Bros. provided to Kiewit was used by Kiewit in the performance of its obligations to STRATCOM, a branch of the United States federal government.

28.     Harris regularly delivered fuel to Kiewit at its worksite at STRATCOM.

29.     With respect to the deliveries of fuel to Kiewit at its STRATCOM worksite, Sapp Bros. instructed Harris to record everything as unit fuel, despite the fact that the deliveries often involved non-unit fuel. The reason for such an instruction was that Sapp Bros. charged a higher price to customers for unit fuel.

30.     Harris questioned the propriety of this practice with Ziph, noting that it was fraudulent to charge all of the fuel delivered to Kiewit at its STRATCOM worksite as unit fuel when in fact, not all of it was.

31.     Ziph responded by telling Harris to keep his mouth shut, and to "record everything at STRATCOM as unit fuel." When Harris later correctly recorded the Kiewit at STRATCOM delivery as non-unit fuel, Ziph confronted him, telling Harris that he was "screwing himself" and implied that Harris should record everything as unit fuel if he wanted to keep his job.

32.     Harris again raised a question about the deliveries to Kiewit at STRATCOM, to which Ziph responded that it didn't matter because "I'm ripping them off anyways."

33.     Before suit was filed, Sapp Bros. maintained that there is nothing improper about its practices with Kiewit and STRATCOM because all fuel to be charged to Kiewit for its worksite at STRATCOM is supposed to be charged as unit fuel as part of Sapp Bros.' arrangement with Kiewit. But, when asked to substantiate that claim before the filing of this action, Sapp Bros. refused to do so.  Likewise, Sapp Bros. never explained its reasoning or communicated to Harris when he questioned Ziph about the propriety of recording these deliveries as unit fuel.

34.     Furthermore, notwithstanding the fact that Sapp Bros. required Harris to record everything delivered to Kiewit at its STRATCOM worksite as unit fuel, Sapp Bros. did not pay Harris the unit fuel rate in his gallon pay for these deliveries.

35.     The unit fuel and non-unit fuel scheme is not the only scheme that Sapp Bros. employs.  Other fuel deliveries lend themselves to Sapp Bros.' desire to pad its accounts.

**Harris' Raises Concerns About Diesel Fuel Deliveries**

36.     On Tuesday, October 25, 2016, Harris was instructed to deliver some "Special 60/40 fuel" to a customer who had ordered 680 gallons of "60/40 fuel."

37.     The Special 60/40 fuel Harris was instructed to deliver to the customer was not actually 60/40 fuel at all, but was regular diesel fuel treated with additives.

38.     Harris knew the Special 60/40 fuel was not the same quality as true 60/40 fuel, and regardless of quality, Harris was alarmed by the fact that the customer had ordered 60/40 fuel but was receiving a different blend than ordered. The customer had previously made clear to Harris that 60/40 fuel was his preferred fuel.

39.     Harris questioned the instructions, stating his concerns that "this is fraud."  Harris was again directed to deliver "Special 60/40 fuel."

6

40.     60/40 fuel is more expensive than diesel treated with additives, which explains Sapp Bros.' incentive in delivering treated diesel but charging the client for 60/40 fuel.

41.     Based on stories related to Harris from other drivers, this is not the first time Sapp Bros. has delivered fuel that does not match the customer's order. Rather, other drivers reported receiving similar instructions and similar threats of those instructions were not followed.

42.     On Wednesday, October 26, 2016, the day after Harris again reported fraud to management, Harris was making a delivery in Treynor, Iowa, which is approximately 30 miles from Sapp Bros. There was a meeting scheduled that day, so Harris called the dispatcher, who then called Harris back at 3:38 p.m.  During this phone call, Harris explained that he was in Treynor, Iowa and had two more deliveries to make, so he "would not be in any time soon" but he would do his best to make the meeting.

43.     Sapp Bros.' policy was that if a driver was making deliveries or otherwise providing service to a customer, the driver should and could report only to the dispatcher that they would either be late or not make the meeting. During his call with the dispatcher, Harris fully complied with this policy. Historically, other drivers, including Harris, had reported only to the dispatcher in similar circumstances and been excused from attending the meetings.

44.     Consistent with what Harris had communicated to the dispatcher, Harris arrived at Sapp Bros. late for the meeting. When Harris walked into the warehouse, he was met by Benson and Chris Klotz ("Klotz"), now President of SBT, Inc., a branch of Sapp Bros., who escorted him into an office and terminated his employment. Benson and Klotz told Harris that he was terminated because he had missed the meeting; however, another driver had arrived at Sapp Bros. at the same time as Harris but that driver was not subject to any adverse employment actions.

7

45.     Furthermore, Benson and Klotz made no mention of the fact that Harris had followed Sapp Bros.' policy by calling in and informing the Sapp Bros.' dispatcher that he would not make it to the meeting on time due to the deliveries he had to make.

**FIRST CAUSE OF ACTION**
**False Claims Act Retaliation**
**(31 U.S.C. § 3730)**

46.     Harris incorporates the foregoing paragraphs as if fully set forth herein.

47.     Harris engaged in protected activity by making efforts to stop one or more violations of the False Claims Act ("FCA"), by identifying and opposing Sapp Bros.' practice of submitting fraudulent claims to Kiewit for fuel to be used by Kiewit in performing its contractual obligations to STRATCOM, such that Sapp Bros. either caused Kiewit to submit a fraudulent claim directly to the government or caused Kiewit to use funds it obtained pursuant to a government program to satisfy the fraudulent claim.

48.     In voicing his opposition to management, Harris informed Sapp Bros. that this practice was fraudulent.  Harris opposed a practice that that involved an objectively reasonable possibility that Sapp Bros. engaged in fraudulent conduct in violation of the FCA.

49.     Sapp Bros. knew that Harris had engaged in this protected activity, as Harris raised the issued and opposed the practice directly with Ziph.

50.     After voicing his opposition and concerns about the possibility of fraudulent conduct, Harris was terminated by Sapp Bros.

51.     Harris was terminated as a result of his opposition to Sapp Bros.' fraudulent practice of submitting claims for unit fuel prices when the fuel provided to Kiewit for use at its worksite at STRATCOM, was non-unit fuel, a practice that Harris reasonably believed to violate the FCA.

8

## SECOND CAUSE OF ACTION
### Fair Employment Practices Act Retaliation
### (Neb. Rev. Stat. §§ 48-1114, 20-148)

52.     Harris incorporates the foregoing paragraphs as if fully set forth herein.

53.     Harris engaged in protected activity by resisting and opposing Sapp Bros.' practice of misrepresenting the fuel it was selling to customers when he argued that such a practice constituted fraud, which he reasonably and in good faith believed to be unlawful.

54.     Harris was terminated by Sapp Bros. on October 26, 2016.

55.     Harris was terminated due to his opposition to Sapp Bros.' practice of fraudulently misrepresenting the quality and nature of the fuel is was selling to its customers.

56.     As a direct and proximate result of Sapp Bros.' wrongful acts, Harris has in the past, and will in the future, suffer injuries and damages, including but not limited to, mental health and emotional distress, anguish, humiliation, fear, embarrassment, lost enjoyment of life, lost wages, benefits, and other emoluments of employment.

## THIRD CAUSE OF ACTION
### Violation of the Wage Payment and Collection Act
### (Neb. Rev. Stat. § 48-1231)

57.     Harris incorporates the foregoing paragraphs as if fully set forth herein.

58.     Harris' bonuses for fuel delivery constitutes wages under the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. §§ 48-1228 through 48-1234.

59.     Sapp Bros. has regularly refused to pay, or underpaid, the bonuses Harris has earned.

60.     Harris has made repeated requests for the unpaid and underpaid bonuses, and Sapp Bros. has not paid Harris the wages he is owed within thirty (30) days of his requests.

61.     Sapp Bros.' conduct and refusal to pay Harris has been willful.

62.     Evidence of the amounts fully due Harris is within the custody of Sapp Bros. and

Harris reserves the right to amend his claims, once the full amount of his damages is ascertained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Thomas Harris, prays for judgment in his favor and against

Sapp Bros. for:

> a.     For back wages, front wages, after mitigation efforts, unpaid bonuses, and
>
>         emotional distress;
>
> b.     For damages incurred by lost insurance coverage;
>
> c.     For reasonable costs and expenses including attorney's fees; and
>
> d.     For such other and further relief as the court may deem proper.

## DEMAND FOR JURY

Plaintiff, Thomas Harris, hereby demands a jury on all issues so triable in the United

States District Court for the District of Nebraska, in Omaha, Nebraska.

THOMAS HARRIS, Plaintiff,


By: /s/ David A. Yudelson
David A. Yudelson, #23257
Patrice D. Ott, #24435
John Dunn, #26025
Koley Jessen P.C., L.L.O.
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124-1079
(402) 390-9500
(402) 390-9005 (facsimile)
David.Yudelson@koleyjessen.com
Patrice.Ott@koleyjessen.com
John.Dunn@koleyjessen.com

Attorneys for Plaintiff